All rise. Court is in session. Please be seated. Madam Clerk, will you please call the next case? Eleventh Court of Appeals, Session Three, People v. Michael Barnes. Okay, will the attorneys please step up to the podium. I want you to state your name, tell the court who you represent, and approximately how long your argument will take. Good morning, Counsel. Good morning. Assistant Defender Levi Harris on behalf of my client, the appellant Michael Barnes. And I anticipate that my argument will take about 13 minutes and a couple minutes for rebuttal. Very good, Mr. Harris. Good morning, Counsel. Your Honors, Margaret Smith, Assistant State's Attorney. I would anticipate 10 minutes. Very good. Mr. Harris, why don't you proceed with your argument. Your Honors, we raised one issue and three subparts in our briefs, and so with the Court's permission, I'd like to address all three of those in the time that I have. My client, Michael Barnes, is serving a sentence for aggravated battery of a child. In July 2009, that child, KT, we call him, lived in a basement with his mom, Felice Tony, his baby sister, Mr. Barnes, who was no relation to any of them, in a home with 14 other people. They had no working shower. They had no baby crib. They had no real permanent beds, no refrigerator, no stove. They had a separate area for the pit bulls, and they had this sink in which they took sponge baths, which also reached 126 degrees when you turned on the hot water. And on July 20, 2009, as my client was babysitting KT in that sort of squalid condition, KT was scalded during a bath by water from that sink. And nobody disputed at trial or here that the child sustained these injuries. Nobody disputed that my client caused the injuries. The only issue at trial was whether the injuries were accidental, whether they were intentional or unknowing, as the aggravated battery statute requires. But the outcome of the trial that Mr. Barnes had on that issue was unworthy of confidence for three reasons. First, he was denied his confrontation right to question Ms. Tony, the mother, about her children being taken away by DCFS, and about the fact that she was still under sentence for a conviction that she had recently before the trial. Second, he was denied his fair trial right when the court let the state introduce evidence that KT, the child, also suffered a liver contusion. And third, he was denied his fair trial right when the court decided to allow the state to show to the jury KT in a state of partial nakedness as a demonstrative exhibit. So we're here asking the court on those bases to reverse and remand. First, the confrontation clause issue. Mr. Barnes was denied his right of cross-examination when the court would not allow him to question the mother of the child about a sentence that she was still under and about her children being taken away by DCFS. The right of cross-examination, as we know, is a primary interest that's secured by the confrontation clause. Witness partiality is always subject to being called on cross-examination. But the sentence you're talking about arose out of Ms. Tony's prostitution, correct? Correct. And her arrests were after these injuries to her son. It's correct that the arrests were after the, yes. And the relevance that you articulate was that perhaps she had worked something out with the state and was motivated to testify the way the state wanted her to so that her prostitution problems would go away. Almost, Your Honor. We're not saying that there was any kind of a deal worked out. We don't know of any kind of a deal that was worked out. You don't know of any, and the state would have been obligated to tell you if there was one. Correct. But, Your Honor, also in some of the cases I believe that were cited offhand, I think it was triplet perhaps, but I could be wrong. They said that this can be, it doesn't have to be proven that the state has concocted this deal, that if you get up there and testify, we'll make all this stuff go away. What's relevant is what the witness believes that she stands to gain from getting on the stand from the state. So it's reasonable to think if you're in this position, you're serving community service, you're still under sentence, you're dependent upon the state and on a judge at some future point to say, okay, you've satisfied your sentence, you're discharged. It's reasonable to think that she's going to get up there and testify exactly as she imagines that the state wants her to in order to help make that go away. Whether the state has promised her anything or not. How does her testimony, I mean, she testifies to what happened when she returned home the following morning, which I don't believe your client disputes, that he said, I gave him a bath, maybe the water was too hot.  And so how is her credibility as to that aspect of her testimony at issue? Well, Your Honor, I believe you're kind of getting at a prejudice issue, I think. It seems like, and correct me if I'm wrong. And I think that Ms. Tony provided plenty of testimony that was damaging to my client. You know, she testified that he had babysat KT on prior occasions without any incident. In fact, I think several times that week. That helps your client, right? I don't know that it does, Your Honor. Because if what we're talking about is whether this is an accident or whether it's intentional, I'm not a father yet. I'm soon to be an uncle. I don't know how often two-year-olds soil themselves. But I can imagine that there would have been prior baths that this man would have given the two-year-old. And so if she's up there saying, well, he babysat him seven times last week or the week before the incident, he was never scalded then, that would tend to show that this act was somehow different, that my client had behaved intentionally, knowingly, in a way that harmed the child. Second of all, she testified that he didn't call her after this happened, which made him look callous or at least indifferent to the child's injuries. Even the experts said that some of these injuries wouldn't have manifested themselves until hours later. But she also testified that when she came home, they got the kid out of his sleeper, got to looking at him, and saw that he had been injured, that Mr. Barnes was like, well, I got to get ready to go to work. So this makes him look- And so when, I'm just trying to imagine the cross-examination. She says that he was in a hurry to get to work. He didn't appear concerned. And isn't it a fact, Ms. Toney, that you've been arrested for prostitution and I don't get the intersection of the two. Well, Your Honor, the arrests, I don't know about the arrests themselves. I think we argued about the arrests. The arrests may be more of a tangential issue, but I think the conviction, the fact that she is still under sentence for this thing, that she is still beholden to the state, is sort of what's in the core of the things that cross-examination is always about. Ms. Toney, isn't it true that you are currently still on community service for a conviction that you had six months before this trial? And so then the closing argument is she's not worthy of belief because she's currently serving out the terms of a prior conviction. I think, I mean, yes, on that part of it, on the parts of her testimony that obviously are damaging to the client, yes, that's the argument that you make. We haven't, I don't want to take us off track of wherever you want to go, but we haven't talked about the DCFS issue yet. And, you know, we're not suggesting that the kids were taken away because of this scalding. We're not even suggesting that they were taken away because of the liver contusion. But they were taken away for some reason. And, you know, assuming that Ms. Toney is like most parents, I would think, and wants her children back, she had reason to get up there and pin whatever bad stuff, whatever neglect, whatever abuse, whatever, you know, indifference to child welfare happened in that house, happened because of this guy. And, you know, to make him look like the bad one, to make him look like, well, you know, he was babysitting the kids all the time. If we just put him in prison, maybe I can get my kids back. But again, there's no suggestion here that DCFS was willing to revisit its decision to take her children away if she testified in a particular way. Your Honor, I don't presume to know much about child welfare law, and I don't presume to know what goes on in the minds of witnesses. I'm imagining myself as a witness. If my children had been taken away partially because I had been neglectful and my kids had been injured, my kids had been abandoned, whatever, and some kind of it, I wanted my kids back, I'm going to try to get on the record every time that I can that, look, this guy was the problem. He's gone now. We don't have to worry about that anymore. Can I please get my kids back? I don't think we have to look at what DCFS had actually done. We have to look at what Ms. Toney could reasonably believe in that situation. She stood to gain from this testimony. So we talked about the error. I don't think the State in its briefs ever acknowledged explicitly that if this is error, this is constitutional error, and they bear the burden of proof of harmlessness beyond a reasonable doubt. They talked about, counsel talked about all the other things they got to ask Ms. Toney on cross-examination. I think I said in my brief, that's like saying, well, look, you got to use a sport to try to hack down a tree, but we didn't let you use the chainsaw. No other evidence came in to replace this evidence. This was the best evidence for getting at Ms. Toney's credibility, and the evidence on intent was closely balanced. If I can move to the issue of the liver contusion, in which the court abused its discretion by allowing the State to present this evidence. As we know, even relevant evidence can be excluded when its prejudice outweighs its probative value, and this evidence was far more prejudicial than probative. My experiences in law, and a little part of law, I'm not a doctor, but when I hear liver contusion, I think about internal organs. I think about damage to something inside. These doctors were up there, both of them, talking about blunt force trauma, significant force. And even when we hear about interrogations and stuff, when you start hearing about organ failure, organ damage, that's when everybody kind of agrees this is torture. And in fact, that's what the State argued over objection in closing argument, that this liver contusion was torture. So this was highly prejudicial evidence, and far more prejudicial than probative, because the State never said exactly when this injury occurred. One expert said, well, the injury had to have occurred about 12 hours, within 12 hours before the liver enzyme spike. But he never testified for sure when the liver enzyme spike was. The other expert said, well, it could have been as much as 24 hours. So you've got a 12 to 24 hour window, with a little room even in those margins. Some of that time, Mr. Barnes had exclusive custody of KT. Some of that time, his mother had exclusive custody of him. Some of that time, there were other children in the house, maybe other adults. I know during part of the time, the mother was sleeping on the couch, while movies were playing, and there were children running around the house. So they never pin down exactly when this injury takes place. They never nail down how it takes place. They say, well, it happened when he was holding down a child in the tote to wash him. Again, I don't have a two-year-old. I've never washed one. I can't imagine it takes that kind of force to keep a kid in a bathtub. Maybe I'll be surprised someday. What evidence connected Mr. Barnes to the liver injury, if any? Thank you, Your Honor. That's my third point. They never pointed out who had caused this injury. They sort of just hold these two things together and say, okay, well, he admits that he scalded this kid. He's sorry about that. He didn't do it on purpose. That's his story. And the state says, hey, look, there's also this liver contusion. That's pretty much it. That's all that there is to tie this to him. And as we argue in our briefs, even to be relevant and admissible, you have to show that this other crime, this prior crime, has occurred and that it's been tied to the defendant that he's been involved in somehow, which the state never did as a threshold matter. So the state acknowledges in its brief that, well, we don't have to show this beyond a reasonable doubt, but more than mere suspicion in order to get this evidence in. Here, that's all there was. There was mere suspicion. Here's this other injury. Let's just plop this down in front of the jury and let them figure out how that implicates my client, Mr. Barnes. Obviously, this error is not harmless. It's not cumulative. There was no other evidence of this. The state wanted this in to prove intent. The state argued that this was torture, that this showed that he was holding his child down with such force. So obviously, the state would be surprised if they learned that the jury did not consider this in reaching its verdict. And as we argue, the evidence was closely balanced. Quickly, if I could, talk about this third sub-issue, that the court abused its discretion by letting the assistant state's attorney exhibit the child to the jury with his pants pulled down to display these scars. This evidence, too, was more prejudicial than probative. Prejudicial evidence, as we know, has an undue tendency to suggest decision on an improper basis, like sympathy, hatred, contempt, or horror. Now, again, I'm trying to imagine myself reacting to this and to see a four-year-old child brought in. You know, a four-year-old child's not like a baby. I learned to ride a bicycle when I was four. He knows what's going on. He knows that he's a child. But maybe not everything. He's not been present for the whole trial. But he knows these people are looking at him. He knows that there's something going on that they're trying to investigate. They pull his pants down. Nobody likes having their pants pulled down. They hold him up, show him to the jury. And, you know, according to the defense counsel, he's hugging the state's attorney at this point in time. And so the jury sees this, and I would imagine that the jury is thinking, look at that poor kid. He's injured. This is terrible. He's embarrassed. Whoever did this should pay. Somebody has got to pay for this. Of course, the jury acquitted your client on the aggravated battery involving heinous injuries. The heinous battery. And, Your Honor, we believe that the reason for that is, you know, a heinous battery was charged based on this injury being caused by a caustic substance. You know, I don't intend any disrespect towards, you know, the trial court on this, but I don't believe that water, you know, he had a case for boiling water as a caustic substance. I don't think just hot water is a caustic substance. I think caustic substance, you think of bleach, you think of acid, something like that. I think there was ample reason outside of this for the jury to have acquitted on that. There just was no evidence that this was a caustic substance. So what's critical for me about this is this evidence didn't bear at all on the one issue that was at issue, which is intent. So the jury is looking at this, they're getting really mad at this kid that's been so injured and he's so embarrassed, and look at him, he's hugging the state's attorney, and it has nothing at all to do with anything but the extent of the injuries, which nobody disputes. And, in fact, you know, that's the cumulative part of this, that the state's attorney already had seven, eight and a half, or eight by ten, eight and a half by 11, excuse me, glossy photographs of these injuries. They didn't need to bring in this child. Certainly they had the right to put on evidence on every element of the offense, even if the defense will stipulate to it, but this was overkill. They had enough. I commend these photos to your honors. Take a look at them. I think they were more than adequate to show these injuries. Finally, this evidence was not harmless because it could have contributed to the verdict and because the evidence was closely balanced on the only thing that they were arguing about, which was intent. If your honors don't have any other questions, I'm happy to ask for reversal of remand and sit down. Thank you very much, Mr. Harris. Ms. Smith. Good morning. May it please the court, my name is Margaret Smith and I'm an assistant state's attorney representing the people of the state of Illinois. You've got to keep that kind of in front of you because it's big. Is that okay? Well, you can move it back. I don't want it to obstruct you.  Sorry. The trial court properly exercised its discretion in providing evidence and precluding defendant from presenting evidence of Felice Toney's arrest for prostitution and her contact with DCFS. The issue the court looks at in determining the sufficiency of cross-examination is what the defendant was allowed to do, what the person was allowed to elicit on cross-examination. Not what they were prohibited from doing, but what they were allowed to elicit. Here, defendant elicited testimony that Felice performed oral sex on the defendant for money. That she in fact performed an act of prostitution. The defendant elicited the fact that the apartment was horrendous, it was horrendous living conditions. As defense counsel mentioned, defense counsel at trial brought out the fact there was no stove, no refrigerator, no working shower, no crib, no changing table, no regular beds, no baby bathtub, they were living with pit bulls and there were at least 14 other people living in the apartment. That was elicited by defense counsel on cross-examination. So defense counsel was allowed to bring out that Felice Toney was a disreputable woman and in fact performed an act of prostitution and that she was raising her child in horrendous living conditions. You also had defendant eliciting the fact that Felice left Cameron with the defendant while she drank alcohol and smoked marijuana that night. She was out partying with her friends. She had done so on previous occasions. You also had the elicitation that Felice woke up at noon the morning of the incident and Cameron was in the care of defendant while she slept until noon. That when Felice came home she didn't immediately notice that Cameron had any injuries. Defendant hammered her on that. You didn't notice right away. This is your child, right? You didn't notice that there was something wrong with him. Defense counsel also elicited that she didn't notice any injuries on Cameron before she left that night, before she left him in defendant's care. Defense counsel also elicited the fact that she did not tell defendant what clothes to change Cameron into, which became an issue in terms of defendants trying to cover up the injuries and mask his intent. The Confrontation Clause guarantees the opportunity for effective cross-examination, but not to conduct cross-examination however the defendant chooses. Here the defendant was allowed to present his theory of the case. The record as a whole establishes that the jury was aware of the factors, adequate factors, concerning the impeachment of Felice Toney as to her character. And that, you have to look at what defense counsel was allowed to present and what they got out on their cross-examination. And here, defense counsel got out, she performed an act of prostitution. She goes out partying with her friends and leaves them with the defendant all the time. And that's what she did this night. And that, she was raising her kid in these horrible, horrible conditions. Defense counsel got that out. They got their theory of the case out. In terms of the DCFS, the court actually testified that if Felice testified differently, at trial, than what was in the DCFS records, they could actually ask her about the DCFS records. But she didn't testify differently. As Your Honor pointed out, she said, he told me the water must have been too hot. I don't know what happened. The water must have been too hot. It was consistent with what the defendant's theory was. She wasn't making anything up. She didn't fabricate any evidence here. Defendant doesn't actually argue. They just want the suggestion of that. Furthermore, Felice did not have any pending arrest for prostitution. And that's actually what the issue was, arrest, not a sentence. That's what defendant argued on the pretrial motion, was the pending arrest would have made Felice want to curry favor with the police and the state's attorney and fabricate testimony. Well, there were no pending arrests. Counsel here is now arguing about a sentence. Actually, there were no pending charges, and they were dismissed pending a diversionary program. There's nothing in the record about a pending sentence. It's all about her arrest for prostitution, which all occurred after the incident here where Cameron was burned and were disposed of before trial and have nothing to do with her character. They have no tie-in. The trial court properly permitted the people to introduce evidence of the liver contusion Cameron suffered within 24 hours of the burn injuries inflicted by defendant to show the presence of intent. So within 24 hours, the liver enzymes are measured at 11 in the morning, which takes you back to 11 a.m. the previous day, assuming that the results at 11 a.m. were the peak, right? Mm-hmm. Do we know they were the peak? Is there anything in the record to say that was the peak of the liver enzymes? I'm not certain that that was the evidence, but what the trial court properly allowed defendant to cross the defendant on and to argue was that the liver contusion could have occurred before Felice left Cameron with the defendant. And again, we're looking at what defense counsel was allowed to bring in, what the defense counsel was allowed to argue. And defense counsel had a chance to argue that it could have been Felice. It could have been anyone in the building who did that. In the other child abuse cases where prior acts of abuse had been brought in, there's been a direct linkage to the defendant. The defendant was in a room with the child. Somebody saw him walking in with the belt, could hear the child crying. So there's some substantial evidence to support the inference that it was the defendant who inflicted the prior injury. Here it's nothing other than there's an injury and this child was with the defendant part of the time, his mother part of the time, other people who resided in the household part of the time. I mean, where is the direct linkage to Mr. Barnes? Well, you have the fact that during that same time period, Mr. Barnes caused the burn injuries. He admitted he caused the burn injuries. And that's he admits he caused the burn injuries. And part of his testimony was it was accidental. And we have Dr. Rosado testifying that the burn injuries are not consistent with the defendant's claim that it was accidental. You don't have the cascading effect. You've got testimony. The state has testimony that the type of injury that K.T. sustained isn't accidental because obviously given the severity of the burns, this child wouldn't have just been struggling to get out of the water. He would have been flailing and screaming. So you've got that. Correct. And the issue is does the jury believe Mr. Barnes when he says, I didn't know the water was that hot and I didn't know he was burned. And so the liver contusion then, you know, Dr. Rosado says, this is a blunt force trauma injury, most likely the result of child abuse. But we don't have anything that connects it to Mr. Barnes, given the evidence. Well, the fact that Mr. Barnes claims it was just another bath and the child wasn't really struggling any more than he would be in a normal bath, this goes to the fact that his whole story about how he bathed Cameron and how these injuries occurred is actually not true. He's trying to make it sound like a normal bath. And the doctor says the cascading effect isn't there. It doesn't match up with what defendant claims. And if you have that going on, that he's actually trying to hold the child in the hot tub in the hot water and the child is actually struggling, he's holding him down. He could have caused that type of injury. It goes to defendant's intent, which is the heart of the case, and it matches up with – Did Dr. Rosado ever say that a liver contusion could result from the pressure of holding a child down? I thought it was a blunt force trauma. And he was talking about a significant amount of force, not holding a child down. Well, that was the testimony. But defense counsel says a two-year-old living in the apartment could have knocked Cameron down and caused it himself. So there was discussion and testimony as to what could have caused it. Force, significant force, would have caused it. Defense counsel argued a two-year-old just walking by could have knocked Cameron down and caused it. And what you have here is you have defendant who's actually burning a child who is struggling. He's claiming it was just a normal bath, and Dr. Rosado testified that it was true. I guess my question is, I don't recall anyone asking Dr. Rosado, could this liver contusion have been caused by an adult trying to hold KT down? I believe you're correct, there wasn't that specific question, but there was testimony by Dr. Rosado that the child would have experienced excruciating pain and been struggling, not sitting in the bath and crying just a little bit uncomfortably, as defendant portrayed the scenario. Defendant said, I was just bathing him. The water must have been a little too hot. I couldn't tell, and I couldn't tell because the burns didn't even come until later. There was a lot of testimony from both doctors about that. And what Dr. Rosado's testimony says, no, it would have been scalding the child right then. The child would have been flailing and screaming, not the way an infant might be uncomfortable and screaming in a bath. This child would have been in excruciating pain with the flesh coming off his body. That's the pain that this child was experiencing. The defendant's scenario is not meshing up with the medical evidence, and therefore it's not an accident. It's medically, it does not appear to be an accident, as defendant is claiming, and it appears to be intentional. Counsel, I thought the testimony was that the child, if the water was that hot and the child was sitting in the tub and or being held in the tub, that the child would have been screaming because he was in pain, but I don't remember anything about the skin peeling off at that moment. No, I'm sorry, I didn't mean to claim it was at that moment. I meant the contact would have resulted in the injuries that did occur where the child cracked. Thank you. So there is a link, and defendant was allowed to point out, and again we're looking at what defendant was allowed to bring out. And defendant was allowed to say, you know, we don't know that defendant caused this. We don't know that defendant caused the liver contusion. The doctors testified it could have happened during the time period that Felice was with Cameron or any of these other occupants of the household were with Cameron. So defendant was allowed to present that evidence. The trial court also properly permitted the people to show Cameron's burn injuries to the jury in addition to the photos taken closely to the time of trial. Here, even if the photos were cumulative, they were allowed to be brought in. And even if this court is concerned that there was something wrong with that, the people shouldn't have been allowed to bring in both the photos and present cameras, The fact here is that defendant was not prejudiced by the jury seeing both the photos and Cameron lie before the jury. As counsel stated, there was no issue. The doctors did not disagree as to whether or not the injuries showed permanent disfigurement. That was the reason the photos were shown. That's the reason that Cameron was shown. That's not an issue. But the point was that Mr. Barnes was not contesting that either. He wasn't contesting the extent of the injuries. Exactly. So we have to look at. So what's the point of having Cameron when the extent of the injuries is not an issue? Well, Cameron's the best evidence. We have to prove up. The people had to prove up that he had permanent disfigurement. And they're allowed to show the best evidence, and that was Cameron. They're also allowed to bring in the photos. And they did that. And there was no prejudice here. As Your Honor pointed out, the jury acquitted defendant of the heinous battery, which was the greater charge. If the jury was so outraged, as defense counsel claims he thinks they probably would have been by the evidence they see, he uses those speculative terms, because we have no proof of that. If the jury was so outraged by seeing Cameron and by seeing the photos, why would they have acquitted him of the greater charge? Well, if the heinous battery was based on the use of a caustic substance, couldn't the jury easily have said, hey, water that's 126 degrees isn't a caustic substance? It may cause burns, but it's not caustic. Well, the jury had a jury instruction as to whether or not the water could have been a caustic substance. And they had that. Again, we don't know. They may have. There was testimony about the temperature of the water, but that wasn't conclusive. So you have the jury that's supposedly so blinded by rage at the defendant acquitting him of the greater offense. You also have the testimony of Dr. Rosado, that defendant's story of accident doesn't match up. Now, this evidence was brought in, Cameron and the photos, to show the element of permanent disfigurement. But it also went to defendant's claim of accident or mistake. And Dr. Rosado said, if you look at those burn injuries, they didn't happen the way defendant claimed. You don't have that cascading effect where you had burns on the same burn. But the pictures show that. When Dr. Rosado was testifying, he was referring to the pictures, saying this does not show a cascading effect. He was showing the photos that were taken at the hospital. And the photos that defense counsel is objecting to on this issue were the photos taken close to trial. As I understand the defendant's position, it's that he's objecting to the fact that Cameron was brought in live. He's not saying the photos themselves were prejudicial. It was the fact that this 4-year-old was brought into court and his pants were pulled down before a jury of strangers. Well, at the pretrial motion, he actually argued that the photos taken close to the time of trial, as opposed to those at the hospital at the time of the incident, should not come in along with Cameron being shown to the jury. So we're talking about two sets of photos, first of all. So Dr. Rosado's testimony had to do with the photos taken at the hospital, which are different photos than what defendant is arguing about in this issue of showing Cameron and photos. So let's make that clear. There are two sets of photos. So the photos showing Cameron at the hospital, they don't have an objection to that. And that's what Dr. Rosado's testimony was based on. Now, they objected to both the photos and Cameron coming in, the photos taken close to trial and Cameron coming in as cumulative. That was actually defendant's argument before the court. But the defendant also objected to showing the child to the jury. Oh, yes. Yes. Yes, they did. And their arguments, the court said, your characterization of what happened is inaccurate. That's not what happened. Of course, he wasn't hugging. He's a four-year-old. How else is he supposed to do that? If you read the record, there's nothing in the record to reflect that what defense counsel argued and their objections actually happened. And, in fact, the court says that that's not what happened. The record doesn't show it, and the court actually argues that defense counsel's arguments about what happened are not sustained by what actually happened in the courtroom. As I read the record, what the assistant state's attorney said was, K.T. had his arms around my neck because he was ‑‑ I'm sorry. Could you repeat that? I'm sorry. K.T. had his arms around my neck, standing there. Defense counsel said that? No, I think the state's attorney said, this is what happened. I don't characterize that as a hug. No, that is not what ‑‑ I believe that was what the court said. I believe it's the court who said that. The state's attorney did not say that. And even if ‑‑ I don't know. I don't believe the state's attorney said he was hugging me. The court said, it's a four-year-old. How else is she going to hold a four-year-old? Okay, that's what the court said. And the record doesn't indicate what defense counsel was characterizing it, and the court actually disagrees with defense counsel's characterization. So you have the record and the judge's statement of what actually happened, which contradict what defense counsel claims. You could read in, and counsel, in fact, said, I would imagine the child would be frightened. I would imagine, I don't have kids, but I would imagine that child would have been upset. Well, there are a lot of mild kids who wouldn't be upset. I could speculate the other way. I can't think of one, honestly. I can't think of a four-year-old who could walk into a courtroom, have his pants taken down in front of strangers, and think that that was just fine. I didn't say it was fine. I'm saying it wasn't necessarily hugging. The way they're characterizing the kid was traumatized. There's nothing in the record to show that. And the judge says to defense counsel when they make that objection, that's not what happened. And do you expect us to just suspend our belief in reality and what four-year-olds are likely to do when they're being held up? He's being held, facing the state's attorney, with his backside to strangers, up high enough for people to see him. So, of course, his arms are going to be around this person's neck. Is that a hug? Is it a tight hold? How is the state's attorney holding him? What it looks like to the jury is still going to look like a hug. It's still going to look like this child is relying on the state's attorney to comfort him. I think the comfort is really the issue, and I think the judge was saying she was just holding the child. The court actually says that's not what happened. It wasn't hugging. She was simply holding the child. She's holding a child. Like you just said, they have to have the arms around. And you can say there's a distinction between a hug and merely holding on to someone for support. And that's what the court said. Your characterization is not accurate. So you have the record, which actually doesn't reflect what counsel argued, and you have the court itself who was there saying. Even if it wasn't a hug, like, Mommy, I love you hug. Just holding, clutching, clinging to the state's attorney because he's frightened or ashamed or embarrassed. It isn't necessarily what the state's attorney believes is a hug, or even what Cameron believes is a hug. It's the perception that the jury has that somehow this child has come now to bond with the state's attorney. It's not the mom holding the child. It's clearly not the defense holding the child. It's not a sheriff holding the child. It's not a DCFS worker holding the child. It's a state's attorney. So there's this now connection between the state's attorney and this frantic child. Okay, well. And that's troubling to me. Well, the record doesn't indicate the hugging or the other things that defense counsel objected to at the time. And the court said, the court was there, said, that's not how it happened, counsel. You can speculate that the child would have been upset, that the child was actually really tightly hugging. But there's nothing in the record to show that. And when defense counsel tried to characterize it that way, the court said, that's not what happened. I thought the court said that it wasn't what the jury saw. Well, the discussion was about how Cameron was being shown to the jury. So the discussion was what actually happened when the jury was seeing. There was discussion about the child having candy before, but that's not the hugging. That's separate. And the issue was the characterization of the hugging. And we can all read in that the child was frightened and traumatized and really wanted to have solace and say, but there's nothing in the record to reflect it. And the court actually says, that's not how it went down. For these reasons and those stated in our brief, the people respectfully request that this Court affirm defendant's conviction and sentence. Any further questions? I'm just trying to figure out how what about this whole case demonstrates, beyond a reasonable doubt, that this man intended to hurt this child? Well, if I may. Not that he didn't hurt the child. He admits that he hurt the child, but that he intended to hurt the child. Okay. That he did this cleaning up after the child soiled himself with the intent to abuse the child, to harm the child. What about this whole case shows that? Okay. Well, with due respect, defendant did not argue that the people didn't prove their case beyond a reasonable doubt. But what we have is the evidence that Dr. Rosado said that defendant's version of burn injuries, the accident isn't medically possible. The burn injuries didn't happen in the manner that defendant said. Even if they didn't, how do we know that there was an intent to hurt this child, to disfigure this child, to abuse this child, and not just clean him up? Because the doctor says it didn't happen the way defendant said. Defendant is lying about the way in which this happened. You have the medical evidence, and you don't have even cascading, which would comport with defendant's version of events. You actually have more severe injuries in the genital region and the bottom region, which would be evidence of the child being forced to sit down. Well, if that were true, then the backs of his legs would also be severely burned, and the lower parts of his legs would be sitting in the water, sitting in hot water. Well, there was testimony that the child might have been moving around because it was so hot. You also have the doctor saying, in his medical opinion, this is all evidence. The burns are evidence of child abuse and not accident. He unequivocally testified to it. This is a doctor who is a board-certified expert in child abuse. And he said, in my professional opinion, these burns show that this child was intentionally burned. It's not an accident. And also pointed out the defendant said, oh, the child was struggling, and defendant changed his, oh, the kid was trying to get out. The kid was flailing. The kid stood up. I had to kind of put him down. And, you know what, there are no burns on Cameron's foot, the doctor pointed out. All these factors, the doctor pointed out the lack of cascading, the concentration of the burns in the genital region, which would comport with holding the child down, or lack of accident. And if the child was trying to struggle and get out, the way defendant claimed, you would have burn injuries on the feet. If he poured the water the way he claimed over Cameron, even if he didn't know it was hot, which is what he claims, you would have had cascading burns down on his shoulders, his ears, his head, in a manner that was more significant than what actually happened. Therefore, in his medical expert testimony, as a board-certified physician in pediatric child abuse, that this was not accidental. The defendant's version of events doesn't make any sense, and it didn't happen that way. You also have the fact that when the defendant came home, he, excuse me, when Felice came home, the defendant had covered him up, no diaper, and a full sleeper in the middle of July in a hot basement. And then defendants say, oh, my gosh, something bad happened. The defendant just said, water must have been too hot. And Felice didn't make anything up about that. That's what Felice told them. The defendant was able to bring in his theory of the case. And the defendant wasn't prejudiced. Anything further? Anything further? Thank you very much, Ms. Smith. Mr. Harris? If I could, I'd kind of like to take these backwards. First of all, we just got done hearing about, well, the expert said this couldn't have happened by accident. If you look at page AA236 of the record, the expert witness admitted on cross-examination, yeah, there could be a reasonable explanation for this. It could have been an accident. Again, I know I've been accused of speculating all over the place. If I had just burned a kid and I knew about it, I would have been out of there. I wouldn't have been getting dressed for work, casually taking my time, putting a kid in the sleeper. I would have been gone. And to me, the very things that counsel says indicate callousness or indifference towards this child's injuries indicate no consciousness of guilt, that he's just going about his business. We spent a lot of time talking about or hearing about, you know, the business about the hug. And I feel like counsel forgot what actually transpired when counsel and trial court were talking about this. AA254 and 55, defense counsel says, Judge, I want to put this on the record. The child was hugging the state's attorney during the portion of the exhibit and giving candy. The court never says that's not what happened. The court never says, well, that's just your interpretation. The court says, first of all, the jurors didn't see the candy part. Second of all, it's a four-year-old boy. The state's attorney picked the boy up, held him against her, and the jurors were shown his pants. I assume there was more than pants or else this was a really poor demonstrative exhibit. So that's what actually happened according to the transcription. I think Your Honor's brought up with counsel, you know, if there was no issue about the Burns, if everybody agrees about the Burns, then why not only bring in these pictures but also have KT in there? You know, we heard about, well, nobody knows what the jury's thinking. We never know what the jury's thinking. We have to investigate and use our minds to imagine what the prejudicial effect of any erroneously admitted evidence would be on a jury. Moving back to the business of the liver contusion, it's not true, as counsel said, that my client Mr. Barton said, well, this was just a regular bath. If you look at page 164, AA164 and 65, he said that Cameron was struggling to get out of the tub, but he kept him in to get him rinsed off. He admitted that he was crying. He said he was trying to play with him to keep his mind off of whatever was aggravating him and told the child, big man, this is just a bath. It's just water. So he, you know, it wasn't just like every other bath. He knew something was amiss. He thought the kid wanted to get out of the bathtub. It's simply not the case that he tried to pass this off as just another bath. Counsel said, well, defense is just trying to infer or imply that a 2-year-old came by and knocked him over and gave him a liver contusion. The evidence, page AA72 and 73, is that there were kids as old as 12 who were living in this house. A 12-year-old can do a heck of a lot of damage to a 2-year-old. Backing up finally to the business of the DCFS evidence and the conviction evidence that was not allowed to be cross-examined about, counsel spent a lot of time talking about what defendant was able to get out, that this woman had given oral sex to my client for money, that she had engaged in prostitution, that she lived in a dirty house, and tries to make it seem like that's the same thing that we're talking about. We're not talking about saying this is a dirty woman, a bad woman. We're talking about that she had a motive to testify falsely, which is different. What about the point that beyond the arrest, we're talking about her participation in a diversionary program? It wasn't a conviction. Well, Your Honor, again, I don't think that that's the case. If you look at page AA60, when they actually finally got the ruling on this, it took forever to get the court to rule on this. The state says that there is a January 29, 2011 arrest for prostitution in Country Club Hills, and that's still pending. She's on community service. Again, to me, that seems like she's still under sentence. Her sentence has not been discharged. She's got to serve out something. Anything any further than that that the state may be privy to about what this case involved is not in the record. Counsel said that my client was able to get out his theory of the case as though Felice Toney is a bad woman is the theory of the case. The theory of the case is that my client did this by accident. And, you know, just being able to get out these things did not get at her credibility the way that this other evidence would have. Counsel said finally that the court said that the DCFS records could be used for impeachment. We weren't talking about trying to use them as impeachment, trying to catch her in a lie about something that was contained in those records. We're talking about the motive to lie or the motive to call her her testimony throughout her entire time on the stand that arose because she had this relationship with DCFS and her children. If Your Honor don't have any other questions, I'm happy to, again, ask for reversal and remand. And thank you. Mr. Harris and Ms. Smith, I want to compliment you on your arguments. This case will be taken under advisement. This court stands in recess.